## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy No. 11-22840-JAD |
| | : | |
| GARY L. REINERT, SR., | : | Chapter 7 |
| | : | |
| Debtor. | : | Doc. # 627 |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯X | : | |
| | : | |
| METAL FOUNDATIONS | : | |
| ACQUISITION, LLC., | : | Adversary No. 11-2656-JAD |
| | : | |
| Plaintiff, | : | Doc. # 1 |
| | : | |
| v. | : | |
| | : | |
| GARY L. REINERT, SR., | : | |
| | : | |
| Defendant. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯X | | |

## MEMORANDUM OPINION

The matters before the Court are a *Complaint in Equity* and a *Motion to Enforce the Sale* filed by the plaintiff, Metal Foundations Acquisition, LLC ("MFA"), against the debtor, Gary L. Reinert, Sr. ("Reinert"), wherein MFA alleges that Reinert converted assets that MFA purchased from this bankruptcy estate (and others), including without limitation, certain personal property, alleged proprietary trade secrets and confidential information. MFA also contends that Reinert intentionally interfered with MFA's existing and prospective contractual relations.

Both parties assert that this is a "core proceeding" under 28 U.S.C. § 157(b)(2) that will affect the administration of the Reinert estate, and that jurisdiction is otherwise appropriate under 28 U.S.C. §§ 1334(b) and 1452(a).

Regardless of whether this matter is a core proceeding, both parties have consented to the entry of a final order or judgment by this Court. (See Doc. # 1, ¶ ¶ 4 and 6). See ARDI Limited Partnership v. The Buncher Co. (In re River Entertainment Co.), 467 B.R. 808 (Bankr. W.D. Pa. 2012) (parties' consent to entry of final judgment by the bankruptcy court permits final adjudiciation by non-Article III bankruptcy court of non-core and core matters alike).

For the reasons set forth more fully below, the Court finds that MFA's *Complaint in Equity* is denied in part and granted in part, and that portion of MFA's *Motion to Enforce the Sale* which was not addressed in the April 10, 2012 Order of Court is granted. Specifically, the Court concludes that:

1. Reinert is estopped from asserting that non-debtor entities own the assets sold to MFA. MFA purchased all of the assets related to the metal foundations business as provided for in the Asset Sale and Credit Bid Agreement (and exhibits attached thereto), regardless whether they were owned by other Reinert controlled entities (such as SAFE Foundations, LLC).

2. Reinert must therefore return to MFA the Tooling, the six boxes of business records, the GAI software and the design drawings that Reinert has converted, or in the alternative to pay MFA an amount equal to the value of these assets. Reinert must return these items to MFA within 30 days. If such items are not returned, MFA may commence proceedings to liquidate its damages claim for any and all damages proximately caused by Reinert's conversion.

3. MFA's missappropriation of trade secrets claim is granted insofar as it relates to the GAI software and design drawings. It is denied as to the vibrator method of installation, the Z-type metal fin foundation, customer lists, and "metal foundations" as a trade name.

4. MFA's tortious interference of contract and interference with prospective contracts is denied.

5. Reinert is permanently enjoined and precluded from selling, using, possessing, and transferring any of the assets acquired by MFA, including without limitation the Tooling, the six boxes of business records, the GAI software and the design drawings that Reinert has converted (and any further design drawings created using any converted design drawings).

6. MFA's request for restitution damages is denied as redundant. MFA's request for damages based on unjust enrichment is also denied as MFA has adequate remedies at law.

7. MFA's request for punitive damages is not granted at this time. Rather, if and to the extent the aforementioned property is not timely turned over to MFA, the Court will consider a punitive damage request in conjunction with proceedings to liquidate MFA's damages claim.

8. Any request by Reinert for damages and attorneys' fees is denied.

## I.

This adversary proceeding arises out of MFA's acquisition of various assets of Reinert-controlled entities while under the auspices of bankruptcy court protection.

The facts of this case reflect that about a year after Fifth Third Bank obtained a receivership order against Reinert and some of his affiliates in the United States District Court for the Western District of Pennsylvania at Case No. 10-mc355[1] in March of 2010, Reinert and a certain number of the companies that he directly or indirectly controls, including Power Contracting, Inc., MFPF, Inc., Metal Foundations, LLC, Dressel Associates, Inc., and Flying

---

[1] The parties have not objected to this Court taking judicial notice of the Receivership proceedings before the United States District Court.

Roadrunner, Inc. (the "Reinert Debtor Entities")[2] commenced voluntary Chapter 11 cases in this Court on May 2, 2011. These bankruptcy cases were then jointly administered[3] and a Chapter 11 trustee (the "Trustee") was appointed to take control of the assets and businesses of each debtor. Ultimately, each of these cases were converted to Chapter 7 liquidations; but during the pendency of the Chapter 11 phase of each case, the Trustee sold certain assets to MFA.[4]

The manner in which the sale occurred was as follows: The primary secured creditor in this case, Fifth Third Bank (who was owed approximately 20 million dollars), sold its secured claim to MFA. The Trustee then sought to sell assets subject to the former Fifth Third Bank lien by way of public auction, with MFA having the right to credit bid its acquired secured claim at the auction. At the auction, the Trustee also sought to sell unencumbered assets

---

[2] An entity known as Grille on the 7th, Inc. also filed for bankruptcy relief. However, none of its assets are the subject to MFA's motion for preliminary injunction.

[3] Given various conflicting interests of the debtor entities, joint administration of the cases was terminated by way of order dated February 28, 2012. All of the events giving rise to the *Complaint in Equity* and *Motion to Enforce Sale*, however, occurred while the cases were being jointly administered by the Trustee.

[4] The Trustee initially was Ms. Carlota M. Bohm. Upon her appointment as a U.S. Bankruptcy Judge with this Court, Mr. Robert Shearer was appointed as her successor Trustee. Creditors then conducted an election and Mr. Eric Bononi was elected successor Trustee and he continues to serve in this capacity.

as the agreement with MFA provided for additional consideration to the Trustee.

At the time of the auction, no bankruptcy schedules were filed setting forth the identity of the various debtors' assets. In fact, at the sale hearing, the Court cautioned the parties about the wisdom of proceeding to an auction when schedules were not on file. Notwithstanding the Court's warning, the parties, each being sophisticated in these matters, elected to proceed to auction. Ultimately, no competing bidder emerged for the assets at issue and MFA was the prevailing purchaser at the conclusion of the auction.

The assets subject to the sale were defined by documents prepared by MFA based upon its own due diligence and with the assistance of the Trustee, Mr. Reinert and their agents. Specifically, the so-called "credit bid letter agreement" dated September 21, 2011 (the "Credit Bid Agreement") provided at Exhibit A that all assets of Flying Roadrunner, Inc., Power Contracting, Inc., MFPF, Inc., Metal Foundations, LLC and Dressel Associates, Inc. against which Fifth Third Bank previously asserted a lien were to be sold to MFA. The Letter Agreement also provided at Exhibit B that certain unencumbered assets of the debtors, including assets of Mr. Reinert, were also to be sold to MFA. Those assets, whether previously encumbered or unencumbered by Fifth Third Bank, were further described in both Exhibit A and Exhibit B to the Letter Agreement as "all of those [assets] used or related to the operation of foundations business" by such entities. Suffice it to say, the assets sold at the auction included, without limitation, all equipment, machinery, vehicles, customer

relationships, goodwill, inventory, books, records, plans, diagrams, drawings, patents, trademarks, service marks, trade names, corporate names, commercial and technical trade secrets, and proprietary software owned by the above referenced debtors.

By Order dated November 8, 2011, this Court authorized the sale (the "Asset Sale") to MFA. The next day, November 9, 2011, MFA closed on the transaction. In connection with this transaction, as it believed it acquired all of the Reinert Entities' metal foundations assets, MFA then released its lien, including the lien it held against the non-bankrupt entities that remained in the Receivership before Chief United States District Judge Gary Lancaster.

MFA contends that subsequent to closing on the transaction, Mr. Reinert engaged in a pattern of behavior that threatened and/or harmed MFA. Specifically, MFA contends that after closing on the sale, Reinert has misrepresented to actual or potential customers of MFA that MFA does not have a proprietary interest with respect to all of the intellectual property associated with the debtors' former metal foundations business. MFA has also contended that Reinert impermissibly misappropriated the customer lists, design drawings, and proprietary software MFA acquired from the estates.

MFA further contends that subsequent to the closing on the sale, Reinert impermissibly caused certain of the physical assets used in the metals foundations business to be transferred to third parties all to the detriment of MFA. MFA essentially contends that Reinert has unlawfully spearheaded an effort to deprive MFA of the benefit of its bargain.

As a result, MFA filed a *Complaint in Equity* against Reinert in the Court of Common Pleas of Allegheny County on December 6, 2011. The complaint (setting forth causes of action sounding in misappropriation of trade secrets, intentional interference with existing contractual relations, intentional interference with prospective business relations, unjust enrichment, conversion, and restitution) included requests for a preliminary and permanent injunction against Reinert. The *Complaint in Equity* was then removed to this Court upon consent of the parties on December 21, 2011.

MFA subsequently filed a *Motion for Preliminary Injunction,* upon which an evidentiary hearing was held and Mr. Reinert appeared and opposed relief. At the conclusion of the evidentiary hearing, the Court took the matter under advisement and instructed the parties to submit proposed findings of fact and conclusions of law. While the *Motion for Preliminary Injunction* was pending, MFA and the Trustee advised the Court that the matters were settled, or were near settlement. As a result the *Motion for Preliminary Injunction* was held in abeyance. Once it became clear that no settlement was in sight (due largely to the election of a new Trustee), and because of the delay caused by the lengthy settlement discussions, the Court then scheduled a trial on the ultimate claim for relief and joined the *Motion for Preliminary Injunction* into these proceedings.

MFA also filed a *Motion to Enforce the Sale* in the lead bankruptcy case on December 6, 2011, alleging that Reinert refused to relinquish control over certain assets MFA argues it purchased in the Asset Sale, and sought an order directing the turnover of the same. These assets include six boxes of business

records now located with Reinert-controlled JET Industries, LLC and certain tooling and equipment now located in India.[5] Reinert filed a Response on December 16, 2011, and an evidentiary hearing was held on June 12, 2012. These matters were also consolidated with the *Complaint in Equity* and further evidentiary hearings were held on the *Complaint in Equity* on August 27, 2012 and September 27, 2012. Both parties subsequently filed post-trial briefs. The matter is now ripe for decision.

## II.

MFA asserts that, pursuant to the terms of the Credit Bid Agreement, it acquired all of the assets owned by Reinert "relating to the metal foundations business." (See Doc. # 1, Attachment 1, pp. 4-5). Reinert disagrees contending that metal foundations assets were owned by non-bankrupt entities which were allegedly not a part of the sale. MFA however asserts that Reinert is estopped from asserting any challenge to the Asset Sale on this basis. In addition, MFA contends that Reinert has misappropriated the confidential trade secrets MFA rightfully purchased in the Asset Sale, and that Reinert has interfered with MFA's prospective and actual contractual relations.[6] (See Doc. # 167). As such, MFA requests a permanent injunction barring Reinert from using any trade

---

[5] MFA's *Motion to Enforce the Sale* also asserted that MFA owned the domain name for Metal Foundations, LLC's website. This issue was resolved by Order of Court dated April 10, 2012 and filed at Case No. 11-22840, Doc. # 953.

[6] MFA also argues that Reinert's challenge to the Asset Sale is barred by 11 U.S.C. 363(m). This Court finds that Section 363(m) does not apply to the instant matter, as no party seeks or sought reversal or modification of this Court's sale order.  Rather, the parties are merely disputing exactly what was sold pursuant to the Court's November 9, 2011 sale order.

secret owned by MFA and from interfering with any of MFA's prospective or current contractual relationships, and seeks actual damages for conversion of assets as well as restitution and punitive damages.

In response, Reinert also avers that no trade secrets were transferred to MFA in the Asset Sale. He contends that the assets that were transferred to MFA are not proprietary trade secrets because they are in the public domain, and any existing trade secrets are owned by Reinert-controlled entities which were not involved in these bankruptcies, including SAFE Extensions and SAFE Foundations, LLC. (See Audio Recording of Hearing Held in Courtroom D, January 31, 2012 (10:45 – 10:46 PM)). Reinert further asserts that MFA has not established a prima facie case of misappropriation of trade secrets or conversion, that MFA has not established a basis for an injunction, and that MFA has not established ownership of the assets in question. Reinert therefore requests that MFA be ordered to pay all costs of this adversary proceeding, and that Reinert is permitted to seek additional claims against MFA.

## III.

In order to determine what assets MFA actually acquired from the Reinert Entities in the Asset Sale, the Court must first address MFA's argument that Reinert is estopped from arguing that SAFE Foundations, LLC and/or other Reinert-controlled non-debtor entities own the assets purportedly transferred to MFA. Because Reinert had a duty to disclose what assets his entities owned in both the bankruptcy actions and the receivership but failed to do so, this Court finds that estoppel applies and Reinert cannot argue at this

late hour that non-debtor entities allegedly own the assets purportedly transferred to MFA in the Asset Sale.

## A.

Under Pennsylvania law, "an estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." Stolarick v. Stolarick, 241 Pa.Super. 498, 509, 363 A.2d 793, 799 (1976), citing In re Tallarico Estate, 425 Pa. 280, 288, 228 A.2d 736, 741 (1967) (internal citations omitted).

The Honorable Bernard Markovitz held that "[e]quitable estoppel consists of two essential elements: (1) inducement; and (2) justifiable reliance on that inducement," and "[t]he conduct that is induced may occur by commission or by forbearance, provided that a detrimental change in condition results." Swope v. Myers Coach Lines, Inc. (In re Lincoln Coach Lines, Inc.), 271 B.R. 61, 68 (Bankr. W.D. Pa. 2001), citing Novelty Knitting Mills, Inc. v. Siskind, 500 Pa. 432, 436, 457 A.2d 502, 503 (1983). Justifiable reliance is established, by a preponderance of the evidence, by proving that the plaintiff "relied in good faith upon the position assumed by the opposite party." Goodwin v. Hartford Life Ins. Co., 491 F.2d 332, 333-34 (3d Cir. 1974), citing Nesbitt v. Erie Coach Co., 416 Pa. 89, 95-96, 204 A.2d 473 (1964). "Stated otherwise, 'the party claiming the estoppel . . . (must establish a) . . . lack of knowledge and of the

means of knowledge of the truth as to the facts in question." Goodwin, 491 F.2d at 333-34, citing In re Watt's Estate, 409 Pa. 44, 65-66, 185 A.2d 781, 792 (1962).

For the reasons set forth below, this Court finds that Reinert did make representations to MFA which constituted inducement for purposes of equitable estoppel, and that MFA justifiably relied on such inducement to their detriment.

Reinert's current position that the assets in question are property of SAFE Foundations, LLC and other non-debtor entitles is in stark contrast to representations Reinert made throughout his bankruptcy and receivership actions. First, at the evidentiary hearing on the *Motion for Preliminary Injunction*, it was conceded that on or about December 22, 2008 (and well prior to Reinert's bankruptcy petition date of May 2, 2011), SAFE Extensions dissolved and wound up its affairs as a corporate entity. As a result, and to the extent SAFE Extension's assets were not liquidated and distributed to its creditors, such assets vested with Reinert and became property of the bankruptcy estate by operation of 11 U.S.C. § 541. Those assets were then sold by the Trustee pursuant to the Credit Bid Agreement and subsequent Order of this Court.

Second, the Court notes that the assets Reinert now claims to belong to SAFE Foundations, LLC would have been in existence at the time the Receiver was appointed by the United States District Court. In those proceedings Chief United States District Judge Gary L. Lancaster entered an Order which

required the Receiver to take immediate possession of all of the assets of certain debtor entities and non-debtor entities, including SAFE Foundations, LLC. The Order of Chief Judge Lancaster also ordered Reinert to cooperate with the Receiver and directed that the receiver liquidate all of the collateral of Fifth Third Bank, which included assets owned by SAFE Foundations, LLC.

During the course of those proceedings, the Receiver liquidated assets known to him, which included only one known piece of equipment owned by SAFE Foundations, LLC. That lone piece of equipment was sold by the receiver to MFA. After the Receiver had liquidated all the assets of the non-debtor entities, the Receiver then sought the termination of his responsibilities as they were fulfilled. With respect to the bankrupt debtor-entities, the Receiver sought an order discharging his duties because the assets of the bankrupt debtor-entities were property of the bankruptcy estates, subject to the supervision of the Trustee. Ultimately, the Receiver was discharged of his duties and the record reflects that Reinert remained silent and never came forward and disclosed the existence of other assets which he now conveniently claims were the assets of SAFE Foundations, LLC. Of course, such assets would have been subject to the lien of MFA. But, MFA was induced to release its lien against SAFE Foundations as it was represented to MFA that all material assets related to the metal foundations business were reposed or vested with the bankrupt Reinert Entities before this Court.

Third, the evidence adduced throughout these proceedings reflect that Reinert had represented to PNC Bank, Fifth Third Bank and the

-12-

Commonwealth of Pennsylvania that one of the debtor's under the control of the Trustee, specifically Metal Foundations, LLC, was the successor to SAFE Foundations, LLC. Such representations continued throughout the bankruptcy cases. In fact, during the sale process that transpired before this Court, the record reflects that this representation was also made by Reinert directly to Lance Shaner of Shaner Capital (which is the owner of MFA).

Fourth, Reinert's representations did not stop there. During the due diligence period leading up to the Court-approved sale, exhibits to the Credit Bid Agreement were circulated to Reinert, and those exhibits stated that the assets belonged to Metal Foundations, LLC. At no time during the due diligence period or thereafter prior to closing did Reinert contend that Metal Foundations, LLC (through the Trustee) did not have title to the assets in question. In fact, Reinert never came forward in any material fashion even though Reinert was noticed for and present at the hearing on the Motion to Approve the Sale, and was provided with the Credit Bid Agreement and its attachments listing the assets to be transferred in the Asset Sale. (See Case No. 11-22840, Doc. # 489). Of course, Reinert testified that he was present at the hearing on the Motion to Approve the Sale, but did not stand up and object or clarify or otherwise disclose to the Court that the attachments to the Credit Bid Agreement reflected assets that were not owned by the Reinert Debtor Entities. (See Audio Recording of Hearing Held in Courtroom D, January 31, 2012 (2:13 – 2:14 PM)). Instead, his counsel merely stated it was his understanding that only assets of the Trustee's estates were being sold. Counsel never came

forward and affirmatively cautioned that non-bankrupt entity assets could be included in the sale.[7]

The Court finds Reinert's failure to come forward throughout this process to be particularly troubling because Reinert had a duty to cooperate with the Trustee "to enable the trustee to perform the trustee's duties ..." See 11 U.S.C. Section 521(a)(3). See also Agresti v. Rosenkranz (In re United Utensils Corp.), 141 B.R. 306, 309 (Bankr. W.D. Pa. 1992) (trustee has a duty to collect property of the estate under 11 U.S.C. § 704(1), and debtor and debtor's counsel has a duty to cooperate with the trustee in that effort).

Reinert, however, has offered excuses for his failure to come forward. Those excuses range from a blanket denial that he received any of the exhibits in question, to a claim that the font size for the exhibits was too small to read, to a claim that he technically was unable to open and access exhibits attached to electronic mail he received, to the contention that if he received the exhibits he was not concerned about their substance. Those excuses are not credible (as they are inconsistent with, and are contrary to, the record) and are not legally acceptable excuses for his failure to timely come forward.

---

[7] The Court notes that the Trustee was the controlling shareholder or unit holder of SAFE Foundations, LLC. At an earlier hearing on the Credit Bid Agreement, the Court inquired what the result would be if non-bankrupt entities owned metal foundation related assets. Counsel to the Official Committee of Unsecured Creditors replied that it was the understanding of all that such assets would be conveyed, and were included in the asset sale to, MFA. Neither the Trustee nor Mr. Reinert (or their respective counsel) disagreed with this representation or understanding.

Reinert's acts, representations, admissions, and silence when he ought to have spoken out induced MFA to purchase Fifth Third Bank's interests in the Reinert Debtor Entities.  Specifically, his participation in the due diligence process and his silence in the Bankruptcy and Receivership actions constitute a representation for purposes of equitable estoppel. Thus, this Court finds that Reinert did make representations that Metal Foundations, LLC owned assets that could be purchased through the Credit Bid Agreement, and that these representations constituted inducement to MFA to purchase the assets and release its lien for purposes of equitable estoppel.

This Court also finds that MFA justifiably relied upon Reinert's inducement, because MFA relied in good faith upon Reinert's assertion that Metal Foundations, LLC did in fact own assets which were transferable to MFA. MFA reasonably relied on Reinert to communicate to MFA what entities owned which assets; because Reinert was under a duty to the courts to honestly disclose such information, such reliance was reasonable and justified. Furthermore, Reinert himself testified that he thought that all assets related to the metal foundations business owned by Reinert-controlled entities were transferred to MFA in the Asset Sale. (See Audio Recording of Hearing Held in Courtroom D, January 31, 2012 (2:14 PM)).

Reinert asserts that MFA knew or should have known that Metal Foundations, LLC had no assets, despite any representations to the contrary by Reinert. Reinert points to two emails in support of this argument: a September 14, 2011 email from Mr. Leo Keevican, Esquire, counsel for MFA

("Keevican"), and a September 19, 2011 email from Mr. William Rader, CPA

("Rader"), the former accountant for the Reinert Entities.

The September 14, 2011 email from Keevican was sent to Mr. Lance

Shaner, Mr. George Wolfe, Mr. David Hirsch, Mr. Roger Bould, Mr. William

Westberg, and Mr. Jim Bonke. (See Doc. # 169, Attachment 1, *Defendant's*

*Exhibit 19E*). Keevican includes in the body of the September 14, 2011 email an

excerpt from an email from Reinert, wherein Reinert asserts, "Have a sale of

one of the patented push-it machines that is attached to the Kebelco [*sic*]

Excavator. ... I did not put [SAFE] Foundation[s] in bankruptcy but when you

buy the bank out you get all assets that bank has lien on which includes

[SAFE]." (See id.) Keevican then writes in his own words, "This machine was

not owned by one of the bankruptcy debtor entities. ... Therefore it is not an

asset we would be acquiring from the bankrupt entities in the 363 sale. If we

want/need this particular machine, the Bank has agreed that it will instruct

the Receiver to sell it to use for $25,000." (See id.)

Reinert argues that this email "clearly demonstrates that Keevican (and

as a result the recipients of the email) had an understanding that the metal

foundations-related assets were owned by Non-Debtor Entities and that such

assets would have to be purchased outside of the bankruptcy." (See Doc. #

169, p. 21). MFA avers that this email instead reflects Reinert's representation

that SAFE Foundation, LLC's "only remaining asset was a Kobelco excavator."

(See Doc. # 167, p. 8). MFA further asserts that MFA purchased this excavator

from the Receiver, and there is "no evidence that Reinert contradicted this

-16-

representation that the only asset SAFE [Foundations, LLC] owned was the excavator prior to Asset Sale." (See id.)

This Court finds that MFA's interpretation was reasonable and justified, especially when viewed in light of the additional representations made by Reinert leading up to the Asset Sale. Reinert's argument that the email proves that the "metal foundations-related assets were owned by Non-Debtor Entities" is unpersuasive and without merit. The email only addresses one particular machine, and does not refer to any other metal foundations-related assets or state that other or all of the metal foundations-related assets would have to be purchased outside of the bankruptcy. Furthermore, if this was Reinert's interpretation of his own words, he should have clarified this intent at the Asset Sale.  This conclusion is particularly acute because (a) Reinert testified that he believed MFA purchased all of the metal foundations assets regardless which entity owned them, and (b) MFA released its lien against all entities.

The September 19, 2011 email was sent by Rader to Mr. William Westberg, in response to an email from Mr. William Westberg to Rader requesting financial information on the Reinert-controlled entities. (See Defendant's Exhibit N-1, Defendant's Exhibit M). Rader asserts in the September 19, 2011 email that he "do[es] not have any information regarding the entities for 2010." (See Defendant's Exhibit N-1). He then writes the following:

> Attached you will find copies of depreciation schedules for the requested companies (other than Metal Fdn which had no fixed assets). These are dated as of 12/31/10, however we have simply rolled over the 2009 schedules but have not added any 2010

additions or deletions. Also attached are copies of the latest (2008) inventory work paper summaries for Metal Fdn. [w]hich consists of purchases from JET industries. None of the other entities had inventory on the books.

(See id.) Five documents were attached to the email, including depreciation schedules for Dressel Associates, Inc., Flying Roadrunner, Inc., MFPF, Inc., and Power Contracting, Inc., and an inventory summary for Metal Foundations, LLC. (See id.)

Reinert argues that after receiving this email "two ... days prior to the submission of the Credit Bid Agreement (and accompanying exhibits) to the Court," MFA was "presented with the opportunity to advise the Court of the existence of any assets owned by the Non-Debtor Entities following the Trustee's submission of the Motion to Sell." (See Doc. # 169, p. 21). MFA asserts in response that the testimony and evidence of record "unambiguously states" that Rader "had no financial information to [Reinert's] various entities past 2009," and as such, "the depreciation schedule ... Rader prepared for SAFE [Foundations, LLC] three years ago necessarily could not reflect the current realities of the [Reinert] Entities." (See Doc. # 167, p. 8). Furthermore, MFA argues that "[t]here was no reason ... to rely on outdated information from ... Rader during the due diligence period when [Reinert] and the [Reinert] Entities were providing current asset lists." (See id. at pp. 8-9). And those lists reflected that the assets were either owned by Metal Foundations, LLC or that Metal Foundations, LLC was the successor to SAFE Foundations, LLC.  This Court therefore finds MFA's argument persuasive. Because more recent information was provided to MFA which contradicted the older information

-18-

from Rader, MFA's reliance on Reinert's representations that the metal foundations-related assets could and would be transferred to MFA in the Asset Sale was reasonable and justified.

The fact of the matter is that Reinert was not only able, but required, to disclose to the courts that assets included in the Credit Bid Agreement were owned by non-debtor entities, yet remained silent at the hearing approving the sale motion, as well as in his Receivership action. MFA justifiably relied on this silence, as well as Reinert's affirmative representations regarding Metal Foundations, LLC's ownership of assets leading up to the Asset Sale. Thus, this Court finds that Reinert is equitably estopped from now changing his tune by asserting that Reinert-controlled non-debtor entities own the assets purportedly transferred in the Asset Sale. Those assets were sold to MFA pursuant to the Asset Sale and Credit Bid Agreement.

## B.

Exhibit A to the Credit Bid Agreement, titled "Secured Assets," asserts that MFA would acquire "all of the assets and rights ..., whether tangible or intangible, that secure the loans made by Fifth Third Bank to Metal Foundations, LLC, MFPF, Inc., Power Contracting, Inc., Flying Roadrunner, Inc. and Dressel Associates, Inc. ..., including without limitation all of those used or related to the operation of the foundations business ... conducted by Debtors." These "secured assets" specifically included "all equipment, machinery and tooling," "customer relationships," "all items of inventory wherever located," "copies or originals or all books, files and records," "all

patents, patent applications, ... trademarks, service marks, ... trade names, ... domain names ... , copyrights, ... commercial and technical trade secrets, ... confidential information, ... designs, drawings, specifications, ... computer and electronic data processing programs and software," and "all computer hardware, software programs, databases and other technology assets." (See Case No. 11-22840, Doc. # 488, Exhibit A, pp. 2-3). Exhibit B, titled "Unencumbered Assets," asserts that MFA would acquire "all of the assets and rights ... identified below owned by any Debtor, including without limitation [Reinert], which assets do not secure the loans made by Fifth Third Bank to Metal Foundations, LLC, MFPF, Inc., Power Contracting, Inc., Flying Roadrunner, Inc. and Dressel Associates, Inc." These unsecured assets specifically included "all patents, patent applications, ...that in any way relate to the operation of the foundations business, ... designs, drawings, ... computer and electronic data processing programs and software, ..." and "all software programs, databases and other technology assets ... used or held for use by any Debtor and used in connetion with the operation of or relate to the [foundations business]." (See id. at Exhibit B, p. 2).

Thus, this Court finds that MFA received the Reinert Entity assets related to the metal foundations business in the Asset Sale, after justifiably relying on Reinert's representations regarding the ownership of assets. MFA therefore purchased all assets listed in both Exhibit A and B to the Credit Bid Agreement.

This includes the six boxes of business records now located with Reinert-controlled JET Industries, LLC referred to in MFA's *Motion to Enforce the Sale*, as paragraph (e) of Exhibit A to the Credit Bid Agreement provides that MFA is to acquire "copies or originals of all books, files and records." (See Case No. 11-22840, Doc. # 488, Exhibit A, p. 2).

MFA also acquired the metal foundation equipment and tooling in India (the "Tooling"), which MFA asserts Reinert caused to be shipped from South Africa to India in July 2012 without the knowledge or consent of the Trustee. It is undisputed that Reinert is still in control of the Tooling.

Reinert asserts that he demonstrated in the evidentiary hearings that the equipment in question was owned by SAFE Foundations, LLC. However, as established above, Reinert is estopped from arguing that SAFE Foundations, LLC, or any other non-debtor entity, is the true owner of any assets purportedly transferred to MFA in the Asset Sale. Paragraph (a) of Exhibit A to the Credit Bid Agreement explicitly includes "all equipment, machinery and tooling." Thus, MFA now owns the Tooling, and Reinert is required to return it to MFA and pay for any conversion of it.

### C.

The assets transferred to MFA in the Asset Sale also include any protectable proprietary information such as trade secrets and tradenames. However, this Court will only find that MFA obtained the assets which actually qualify as protectable proprietary information and trade secrets under Pennsylvania law.

Pursuant to Asset Sale, MFA purchased all confidential and proprietary information in the nature of a trade secret related to the same. MFA asserts that that these trade secrets include: (a) the vibrator method of installing metal foundations; (b) the z-type metal fin foundation design; (c) customer lists of the Debtor Entities; (d) the GAI software used to create engineering designs; and (e) the technical/design drawings that the Debtor Entities created using the GAI software or otherwise. (See Doc. # 167, p. 15). In addition, MFA attempted to state a claim regarding tradename infringement at trial, but never included this argument in their pleadings or provided supporting case law or evidence, and as such seems to have abandoned this argument. Regardless, this Court will also analyze whether MFA acquired a tradename capable of protection in the Asset Sale.

A trade secret claim in the federal courts is governed by state law. Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429 (3d Cir. 1982). Trade secrets are statutorily defined in Pennsylvania as:

> [i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique, or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5301. Factors considered in determining whether information is one's "trade secret" include:

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees

and others involved in the owner's business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

See Restatement of Torts § 757, Comment b; Prudential Ins. Co. of America v. Stella, 994 F. Supp. 318, 323 n.2 (E.D. Pa. 1998); Warehime v. Warehime, 580 Pa. 201, 860 A.2d 41 (2004). "The crucial indicia for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'" O.D. Anderson, Inc. v. Cricks, 2003 Pa. Super. 13, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003), citing Restatement of Torts § 757, Comment b.

In order to conclude what specific trade secret assets MFA purchased in the Asset Sale, this Court will analyze whether the assets described above are trade secrets under Pennsylvania law.

### *Vibrator Method*

MFA asserts that the vibrator method of installing metal foundations is a protectable trade secret because it is "a unique creation of former employees of the Debtor Entities that was not and is not generally known to others in the metal foundations industry, and allows for speedier and often more cost-efficient installation that provides a competitive edge over other metal foundation entities." (See Doc. 167, p. 16). At trial, Mr. Michael Schuler ("Schuler"), a former employee of Metal Foundations, LLC, testified that the vibrator method was created by combining and modifying two existing

machines, which had not been done before within the metal foundations
business. (See Doc. # 47, pp. 46:23 -25, 47:1-8). Schuler also testified that he
was unaware of its use by anyone else in the metal foundations business. (See
id. at p. 47:4-8).

However, Schuler admitted that the vibrator technology is commonly
used in the "piling industry." (See Doc. # 48, p. 48:5-8; see also Defendant's
Exhibit AK, p. 194:7-8). Schuler also admitted in his deposition that ITG, a
metal foundations vendor, also uses the vibrator method of installation. (See
Defendant's Exhibit AK, p. 194:4-5). In addition, Reinert testified that Bechtel
and Bright Source installed metal foundations by "similar means." (See Doc. #
169, p. 14).

While Schuler did testify that the vibrator method was created through
"trial and error," and that it took "a couple days to get the bugs out of it," (See
Doc. # 48, p. 48:12-18), MFA fell short of proving that a significant amount of
effort or money was required to develop the vibrator method. Furthermore, no
Reinert Entity employee, nor Reinert himself, applied for a patent on the
vibrator method, or took action against Bechtel[8] or other metal foundation
businesses after learning that the other market participants used the vibrator
method.  In addition, MFA has not proven that reasonable efforts to maintain

_____

[8] This Court does note that Reinert did execute a non-disclosure agreement
with Becthel, suggesting some efforts were taken to protect the confidential
nature of this asset. However, Reinert testified that he was aware of Bechtel
using the vibrator method, but took no action to stop Bechtel from doing so.
This Court therefore finds that the efforts taken to protect the vibrator method
were not significant.

the secrecy of the vibrator were taken by the Reinert Entities prior to the Asset Sale.

For these reasons, and because the vibrator method is known outside of MFA's business, and could be acquired or duplicated by others by renting and combining existing equipment, this Court finds that the vibrator method is not a trade secret under Pennsylvania law.

### Z-type Metal Fin Foundation

MFA asserts that the z-type metal fin foundation is a trade secret, as it is an "improvement over the original type of metal foundation because it provides the same level of structural support as the older model, while being less expensive to fabricate and install." (Doc. 167, p. 16).

Reinert argues that that the z-type metal fin foundation is not a trade secret because it is "in the public domain." In support of this argument, Reinert asserts that the z-type metal fin foundation was never protected by a patent while owned by the Reinert-controlled entities, and argues that Mr. Dennis F. Zeszutek ("Zeszutek") "admits [in his depotision] that the [z-type metal fin foundation] was used by Roseidin Electric sans any [non-disclosure agreement]." (See Doc. # 169, p. 4). However, Zeszutek actually admitted that a non-disclosure agreement was sent to Roseindin Electric, but could not remember if it had been signed, or if it specifically covered the z-type metal fin foundation. (See Defendant's Exhibit AJ, pp. 93:24-25, 94:1-8).

Zeszutek also asserted in his deposition that Mr. Davide Luiddeli ("Luiddeli"), a design engineer, developed the z-type metal fin foundation as an

-25-

employee of Metal Foundations, LLC. (See Defendant's Exhibit AJ, pp. 88:10-11, 89:15-17). According to Zeszutek's deposition, Luiddeli patented the z-type metal fin foundation in 2012, at a time when he was an employee for MFA. (See id. at p. 90:11-23). The patent is in Luiddeli's name, and Luiddeli has an arrangement with MFA so that only MFA can use it. (See id. at p. 91:1-4).

The patent on the z-type metal fin foundation did not exist prior to the sale. MFA has not presented any evidence that a patent application was filed prior to the sale, which would suggest that efforts were taken to protect its confidentiality prior to the sale. Furthermore, MFA did not successfully refute Reinert's argument that other individuals and entities are using the z-type metal fin foundation. It is MFA's burden to prove to this Court that the z-type metal fin foundation is a protectable trade secret that it acquired from the Trustee, and MFA has failed to meet its burden here. Therefore, the z-type metal fin foundation is not a trade secret which was transferred to MFA in the Asset Sale.   At most, the preponderance of the evidence is that it may be intellectual property owned by Luideli, which in-turn is licensed by Luideli to MFA.   That is a separate transaction apart from the Asset Sale and is not the subject to the instant litigation.

### Customer Lists

Pennsylvania law affords protection to an employer's confidential customer information. Van Products Co. v. Gen. Welding & Fabricating Co., 419 Pa. 248, 262, 213 A.2d 769, 777 (1965), citing Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957). As with any other trade

secret, for customer information to be protectable it must be a particular secret of the business, of value to the employer and wrongfully appropriated by the employee. Van Products, 419 Pa. at 263. Pennsylvania courts have found customer data to be protected as a trade secret where customer data is both confidential and highly valuable. See Morgan's Home Equipment, 390 Pa. at 624-25. However, where customer data is available through published lists of suppliers and other catalogue and sales publications, protection has been denied. See Vincent Horwitz Co. v. Cooper, 352 Pa. 7, 41 A.2d 870 (1945).

MFA argues that Zeszutek testified that the customer lists at issue, which were created and maintained by Zeszutek, were and are comprised of entities that have a specific interest in utilizing metal foundation technology. MFA further argues that "[t]he need for such technology is unique to certain industries, and the ability to successfully identify and target such entities is key," and that "[t]he Debtor Entities invested significant time and resources in maintaining the customer lists." (See Doc. # 167, p. 16). Notwithstanding these broad allegations, MFA did not enter customer lists into evidence or otherwise supply this information to the Court.

Reinert asserts that the customer lists are actually "contact lists" of potential clients, and that these lists were never confidential. (See Doc. # 169, p. 5). Reinert also argues that "Ray Petcovic … testified that he took the information with him when he left employment at the Reinert Entities and that he still uses it and stays in contact with old customers," suggesting not much effort was taken to protect the customer lists. (See Doc. # 169, p. 14). Reinert

-27-

also argues that because "MFA did not introduce these 'customer lists' into evidence, and did not produce any evidence as to which customers were on said lists, ... the Court is altogether unable to determine if or how Reinert misappropriated or otherwise misused the information." (See Doc. # 169, p. 11). This Court is persuaded by Reinert's argument here.

According to Zeszutek's testimony, these lists were created once Reinert and others associated with the Reinert Entities "would contact businesses and organizations that were engaging in a construction project where metal fin pipe foundations could be utilized. Once that initial contact was made, the information was turned over to ... Zeszutek." (See Doc. # 43, pp. 56:7-57:7). Without a physical review of these lists, or further proof offered by MFA that these lists are of value and contain secret or protected information, this Court cannot determine whether they constitute a trade secret.[9]

"A plaintiff claiming its trade secrets have been misappropriated [pursuant to Pennsylvania law] ... has the obligation to identify those secrets "with reasonable particularity." Hill v. Best Med. Int'l, Inc., CIV.A. 07-1709, 2011 WL 5082208, *5 (W.D. Pa. Oct. 25, 2011). "Such specificity is required in order for the defendant to be adequately apprised of what it is alleged to have

---

[9] The Court also does not have any evidence that Reinert himself is personally in possession of an actual customer list (to the extent one exists). Of course Reinert worked for many years in the metal foundations business, and the Court is not aware of any basis upon which Reinert would be prohibited from relying on his own knowledge of market participants to engage in potential business. Had MFA desired to keep Reinert from competing with MFA, they could have entered into a non-compete agreement with him. However, no such agreement was reached.

misappropriated." Id. MFA has not met its burden of identifying these lists with reasonable particularity. As such, this Court cannot find that the customer lists are protectable trade secrets.

### GAI Software

Prior to the creation of Metal Foundations, LLC, SAFE Foundations, LLC commissioned the creation of a computer program known as the GAI software, which is used by engineers to create designs for metal foundation installations. (See Defendant's Exhibit AK-1, pp. 85:1 – 86:6). MFA asserts that the GAI software is a protectable trade secret, as it "was and is an integral part of the design process and incorporates the experience and knowledge gained from past Debtor Entity projects." (See Doc. # 167, p. 18). In addition, Mr. Geoffrey Feidelberg ("Feidelberg") testified the software is "an integral part of the ability to conduct business as the go forward entity." (See Doc. # 50, p. 86:5-6).

Reinert counters that SAFE Foundations, LLC, as the entity that created the computer program, owns a copyright in the GAI software; because copyrights may only be transferred by written agreement and MFA produced no evidence that any such copyright was transferred from SAFE Foundations, LLC to MFA, Reinert asserts that SAFE Foundations, LLC still owns the GAI software. However, MFA acquired all assets listed in the exhibits to the Credit Bid Agreement; "copyrights" are specifically included in paragraph (f)(iii) of Exhibit A. Therefore, Reinert's argument that the copyright has not yet been assigned does not support his claim that SAFE Foundations, LLC still owns the copyright. Moreover, as previously discussed, Reinert has a duty to cooperate;

as such, he must help complete the transfer of the GAI software to MFA. If that requires an assignment of the software's copyright from SAFE Foundations, LLC to MFA, Reinert must provide such an assignment to MFA to complete the asset transfer.[10]

### Design Drawings

Reinert, in his own testimony, stated that these design drawings at issue, whether they were created by the GAI software or otherwise, were based upon the specifications for specific projects for which metal foundations were going to be utilized, and would serve as examples or starting points from which foundations would be designed for future projects. (See Doc. # 167, p. 16). Because each design drawing was unique and specific to particular projects, and because they could be used as starting points for future projects, this Court finds that these design drawings are of value for purposes of determining whether they are trade secrets.

Furthermore, efforts were taken to protect their confidentiality. All design drawings created by the Reinert Entities prior to the Asset Sale were clearly

---

[10] However, Reinert also argues that a small number of individuals who worked for and with his entities had access to the GAI software still have access to it. (See Doc. # 45, pp. 18:24-25, 19:1-4). Reinert's testimony was that these were individuals whom "we all intertwine with." The Court holds that the limited use of GAI software by these business associates does not extinguish the trade secret nature of the GAI software. See TXCO Resourced, Inc. v. Peregrine Petroleum, LLC (In re TXCO Resources, Inc.), 475 B.R. 781, 805 (Bankr. W.D. Tex. 2012). To the extent MFA does not, and has not, granted a license to these limited persons or entities, MFA is free to pursue its remedies, whatever they may be, in a court of competent jurisdiction.

marked with a legend noting the confidential and proprietary nature of the information. (See Plaintiff's Exhibit 27). In addition, Reinert specifically requested the return of design drawings in an email sent to AES Solar after AES Solar rejected a proposal Reinert had submitted. (See Plaintiff's Exhibit 43). MFA also submitted as evidence sixty-nine non-disclosure agreements which Reinert and Reinert entities executed with other entities and individuals, wherein "confidential information" is frequently defined as including "designs." (See Plaintiff's Exhibit 25).

For these reasons, this Court finds MFA met its burden in establishing the design drawings as trade secrets.

### Tradename

While MFA does not assert in its pleadings that the tradename of "Metal Foundations" is a trade secret, MFA attempted to articulate a claim for tradename infringement at trial, which would require a finding that "Metal Foundations" is a protectable tradename.

Two elements must be proven to establish tradename infringement or unfair competition: (1) that the tradename is distinctive and thus protectable; and (2) that the second-comer's actions cause a likelihood of confusion among the relevant buyer class. Chi Chi's Inc. v. Chi-Mex, Inc., 568 F.Supp. 731, 734 (W.D.Pa.1983). A tradename is distinctive if: (a) the tradename is inherently distinctive, or (b) even if not inherently distinctive, the tradename has become distinctive through the acquisition of "secondary meaning." Id. Thus, MFA

-31-

must prove that "Metal Foundations" is either inherently distinctive or has acquired secondary meaning in order to acquire protectable tradename status.

There are four categories of tradenames and trademarks: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Id., citing McGregor-Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126 (2d Cir.1979). "A descriptive term is one which conveys an immediate idea of the ingredients, qualities, or characteristics of the goods. Such a term is entitled to trademark protection only if it has acquired secondary meaning." Chi Chi's, 568 F.Supp. at 734. This Court finds that "Metal Foundations" conveys an immediate idea of the characteristics of the product (i.e., foundations made of metal), and as such is a descriptive term. Therefore, in order to have a viable claim for tradename infringement, MFA must prove that "Metal Foundations" has secondary meaning.

Secondary meaning is "the association in the public's mind between a product and its source which occurs when an inherently non-distinctive designation changes to being distinctive of the particular product." Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co., 316 U.S. 203, 203, 62 S.Ct. 1022, 1023, 86 L. Ed. 1381 (1942). Stated in other words, a descriptive trade name acquires "secondary meaning" when there is evidence that a substantial proportion of the public associates the trade name with the plaintiff. See 17 Causes of Action 579, Part II, Section 6 (Thompson Reuters 2012). MFA, however, failed to introduce any evidence suggesting that a substantial proportion of the public associates the descriptive phrase "metal

foundations" with MFA. In fact, because other companies fabricate and install metal foundations and refer to such foundations as "metal foundations" and "steel foundations", MFA has failed to prove that "metal foundations" has acquired secondary meaning. Therefore, "metal foundations" is not a protectable tradename.

## IV.

MFA asserts that with respect to the assets purchased by MFA, Reinert is liable or should be enjoined under the following legal theories: (a) misappropriation of trade secrets; (b) conversion; and (c) intentional interference with existing and prospective business relationships. Each of these theories for relief are addressed below.

## A.

MFA asserts that Reinert should be found liable or enjoined because he "willfully and improperly" acquired and/or retained confidential and proprietary information of the Debtor Entities that is now owned by MFA, and "there exists the threat that such misappropriation will continue." (See Doc. # 167, p. 17). Furthermore, MFA alleges that Reinert, as principal and sole shareholder of the Reinert Debtor Entities, "is under a continuing duty to maintain the secrecy of the trade secrets acquired by MFA in the November 2011 transaction approved by this Court." (See id.)

Under the Pennsylvania Uniform Trade Secret Act ("PUTSA"), actual or threatened misappropriation of a trade secret may be enjoined, and a complainant is entitled to recover damages for misappropriation of a trade

secret. 12 Pa. Cons. Stat. Ann. §§ 5302, 5304 (2011). "Misappropriation"

includes:

> (1) acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means; or (2) disclosure or use of a trade secret of
> another without express or implied consent by a person who: (i)
> used improper means to acquire knowledge of the trade secret; (ii)
> at the time of disclosure or use, knew or had reason to know that
> his knowledge of the trade secret was: (A) derived from or through
> a person who had utilized improper means to acquire it; (B)
> acquired under circumstances giving rise to a duty to maintain its
> secrecy or limit its use; or (C) derived from or through a person
> who owed a duty to the person seeking relief to maintain its
> secrecy or limit its use; or (iii) before a material change of his
> position, knew or had reason to know that it was a trade secret
> and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302.

In order for a plaintiff to prevail on a claim of misappropriation of trade

secrets it must prove two things: the existence of a trade secret that it owns,

and the defendant's wrongful misappropriation of said trade secret in violation

of a covenant or confidential relationship. Wexler v. Greenberg, 399 Pa. 569,

577; 160 A.2d 430, 434 (1960). "Ownership of a trade secret ...does not give

the owner a monopoly in its use, but merely a proprietary right which equity

protects against usurpation by unfair means." Wexler v. Greenberg, 399 Pa.

569, 583; 160 A.2d 430, 437 (1960).

Generally, to be liable for misappropriation of trade secrets in

Pennsylvania, Reinert must have "wrongfully" disclosed the trade secrets in

violation of a covenant or confidential relationship, although a claim for

misappropriation may be permissible in a wider context. O.D. Anderson, Inc. v.

Cricks, 2003 PA Super 13, 815 A.2d 1063, 1072 (Pa. Super. Ct. 2003), citing

Den-Tal-Ez, Inc. v. Siemens Capital Corp., 389 Pa. Super. 219, 249, 566 A.2d

1214, 1228-1229 (1989). The Den-Tal-Ez Court stated that one who discloses

or uses another's trade secret, without a privilege to do so, is liable to another

if: (a) he discovered the secret by improper means, or (b) his disclosure or use

constitutes a breach of confidence reposed in him by the other in disclosing the

secret to him. See id.

Thus, the issue here is whether, at the time of disclose or use, Reinert

was under any express or implied duty to MFA to limit the disclosure of the

design drawings and GAI software, or if Reinert obtained the design drawings

and GAI software by improper means.

At trial, MFA did not offer much evidence as to how Reinert obtained the

design drawings or GAI software to the exclusion of the bankruptcy estates.

However, as set forth above, Reinert has had a continuing duty to cooperate

with the Trustee pursuant to Section 521 of the Bankruptcy Code.  Taking

such assets and withholding them violates such a duty.  As such, MFA has

proved that Reinert misappropriated the design drawings and the GAI software

in violation of the duties imposed upon him at law.

**B.**

This Court will next determine whether Reinert is liable for conversion for

the Tooling in India, the design drawings, and the GAI software.

Pennsylvania courts have defined conversion as "the deprivation of, a

chattel, or other interference therewith, without the owner's consent and

without lawful justification." Bank of Landisburg v. Burruss, 524 A.2d 896, 898 (Pa. Super. 1987), appeal denied, 532 A.2d 436 (Pa. 1987), quoting Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 726 (Pa. 1964). The gravaman of MFA's conversion claim is that MFA purchased various personal property assets utilized in the debtors' metal foundations business, and that Mr. Reinert has, or continues to, divert the personal property to his own uses.

Reinert argues that MFA's claim of conversion should fail because MFA "did not offer any evidence to show that any losses from the alleged conversion were proximately related to actions Gary Reinert." (See Doc. # 169, p. 18). However, as discussed at length above, estate property was conveyed to MFA in the Asset Sale, and Reinert is estopped from arguing otherwise. MFA is the rightful owner of the Tooling in India, the six boxes of business records at JET Industries, the design drawings, and the GAI software.

MFA produced evidence that in July 2012, Reinert caused the Tooling to be shipped to an entity in India known as VIJ Engineering, Ltd. MFA has also shown that Reinert has maintained control over six boxes of business records and continues to use the GAI software. Furthermore, MFA has convinced this Court that Reinert may continue to divert such assets.

Because Reinert refuses to relinquish control over the Tooling, without MFA's consent and without lawful justification, Reinert is depriving MFA of its chattel. Thus, Reinert is liable to MFA for conversion for the Tooling in India. Reinert's usage of and control over any design drawings also serves to deprive

MFA of its chattel; Reinert is therefore also liable for conversion of any design drawings which Reinert has refused to turnover to MFA after the Asset Sale.

Regarding the GAI software, it is obvious that Reinert's possession of the GAI software deprives or adversely impairs with MFA's rights, including its right to license such software to others for a profit.

This Court therefore finds that Reinert is liable to MFA for conversion of the six boxes of business records, the design drawings, the Tooling in Africa, and the GAI software which were transferred to MFA in the Asset Sale and over which Reinert still maintains control.

### C.

MFA further asserts a claim for intentional interference with prospective and current business relationships.

The requisite elements for a claim of intentional interference with prospective or existing contractual relations are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Milicic v. Basketball Mktg. Co., Inc., 857 A.2d 689, 697 n.4 (Pa. Super. Ct. 2004).

Reinert argues that MFA's tortious interference claim fails because MFA failed to prove the existence of a contractual or prospective contractual relation between itself and a third party. This Court agrees.

Establishing a claim of "[t]ortious [i]nterference with [c]ontract requires the same element as breach of contract cases -- the existence of a contract." Williams v. Nationwide Mutual Insurance Co., 750 A.2d 881, 884 (Pa. Super. Ct. 2000) ("Thus, in order to prove that a contract existed in a case, plaintiff must attach a copy of the contract to the Complaint ... Therefore, plaintiff has failed to prove the 'existence of a contract' element ... and cannot recover in this case."). Furthermore, with respect to prospective contracts, the Pennsylvania Supreme Court has adopted the view that there must be a "reasonable likelihood or probability" that the prospective contractual relationship will indeed be consummated, and that the applicable standard "is an objective standard which of course must be supplied by adequate proof." Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208-09, 412 A.2d 466, 471 (1979), citing Glenn v. Point Park College, 441 Pa. 474, 480-81, 272 A.2d 895, 898-99 (1971). Therefore, MFA cannot establish a claim for intentional interference with prospective contractual relations where it "fail[s] to allege facts showing that there was a reasonable probability that [it] would have entered into a specific [contractual relationship] with that third party and, but for the [defendant's wrongful conduct], they would have done so." Thompson Coal Co., 412 A.2d at 471.

MFA has not supplied any evidence or testimony supporting such reasonable likelihood or probability with respect to consummation of a prospective contractual relationship.

It is true that MFA alleges that it was "preparing to enter into a business relationship with Crescent Dunes Solar Energy Project at Tonopah," but Reinert "intentionally and willfully acted to prevent the consummation of this relationship." (See Doc. # 167, pp. 21-22, referencing Plaintiff's Exhibit 41). Similarly, it also is true that MFA asserts Reinert purposefully represented himself to AES Solar after the Asset Sale as a "Metal Foundations" company "in order to prevent AES Solar from executing a contract with MFA. (See Doc. # 167, p. 22, referencing Plaintiff's Exhibit 43). However, neither exhibit referenced, nor any other evidence or testimony, support the argument that MFA had a reasonable likelihood or probability of consummating an actual contractual relationship with either Crescent Dunes or AES. In fact, no representative of Crescent Dunes or AES offered testimony to the effect that but for Mr. Reinert's conduct, MFA would have had a reasonable likelihood of consummating a contractual relationship with such entities. Therefore, MFA's claim for intentional interference with contractual relationships (whether actual or prospective) must fail.

### D.

MFA also sets forth an argument for unjust enrichment, arguing that benefits were conferred on Reinert by MFA, Reinert appreciated such benefits, and Reinert accepted and retained such benefits under such circumstances

that it would be inequitable for Reinert to retain the benefit without payment of value. (See Doc. # 167, p. 21). However, equitable relief is available only to those claimants that lack an adequate remedy at law. In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 224, 238 (M.D. Pa. 2010). Because this Court has found that Reinert is liable for conversion of certain assets owned by MFA, MFA does not lack an adequate remedy at law; MFA's equitable argument for unjust enrichment is therefore inapplicable.

## V.

In its prayer for relief, MFA requests a permanent injunction barring Reinert from the use of any trade secret MFA acquired, and an injunction barring Reinert from interfering with any of MFA's prospective or current contractual relationships. MFA also requests damages.

## A.

The Third Circuit has held that a court may issue a permanent injunction where the moving party has demonstrated that: (1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the "balance of equities" favors granting injunctive relief. Chao v. Rothermel, 327 F.3d 223, 228 (3d Cir. 2003) citing Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., 747 F.2d 844 (3d Cir.1984). The standard for granting permanent injunctive relief is the same as for a temporary injunction, except that the moving party must show actual success, rather than probable success, on the merits. Baskin-Robbins v. Neiberg (In re Neiberg), 161 B.R. 606, 612 (Bankr. W.D. Pa. 1993.

Thus, this Court will analyze the following factors in determining whether to grant a permanent injunctive relief: (1) actual success on the merits; (2) the extent to which the moving party is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if an injunction is issued; and (4) the public interest. See Neiberg, 161 B.R. at 612, referencing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197–98 (3d Cir.1990).

MFA requests that this Court permanently enjoin Reinert from the use of any trade secret owned by MFA, and from interfering with any of MFA's prospective or current contractual relationships. For the following reasons, this Court will grant a permanent injunction enjoining Reinert from using the GAI software and from using any design drawings created by any Reinert Entity prior to the Asset Sale, or from any design drawing created thereafter but based on a design drawing created prior to the Asset Sale.

Issuing an injunction in this regard is appropriate as MFA has succeeded in proving to this Court that the design drawings and GAI software are trade secrets, satisfying the requirement of "actual success on the merits." In addition, MFA will be harmed by MFA's continued use of the GAI software and the design drawings which MFA now rightfully owns. MFA believed that the design drawings and GAI software were being purchased in the Asset Sale as proprietary and protected information; to not enjoin Reinert's continued use of the design drawings and GAI software would be to deprive MFA's benefit of the bargain. In addition, while previous design drawings can be used as a starting

point for future design drawings, each design drawing is specific and unique to the project for which it is created. Thus, enjoining Reinert from using the design drawings will not irreparably harm Reinert, as he is free to create new design drawings for any future endeavors. He is also free to purchase other design software from another vendor.

Lastly, granting the injunction will not adversely affect the public interest. Rather, the public interest is best served by upholding this Court's authorization of the Asset Sale and adhering to Reinert's representations made therein.

Therefore, this Court will permanently enjoin Reinert from using GAI software and any design drawings created by any Reinert Entity prior to the Asset Sale, or from any design drawing created thereafter but based on a design drawing created prior to the Asset Sale. However, because MFA's claim for intentional interference with contractual relationships was unsuccessful on the merits, MFA's request for a permanent injunction enjoining Reinert's interference with contractual relations will not be granted.

**B.**

MFA also requests actual, restitution, and punitive damages. This Court will award MFA actual damages for conversion to the extent such assets are not returned to MFA.

MFA successfully argues that Reinert deprived MFA the benefit of, and otherwise used and interfered with, property owned by MFA, including the Tooling located in India, the six boxes of business records, the GAI software,

and the design drawings pertaining to the metal foundation business. MFA asserts that it is therefore entitled to an "order from this Court mandating the return of these items, or damages from [Reinert] in an amount equal the value of said property." (See Doc. # 167, p. 23). This Court agrees.

Reinert must therefore return to MFA the Tooling, the six boxes of business records, the GAI software and the design drawings, or in the alternative to pay MFA an amount equal to the value of these assets. Reinert must return these items to MFA within 30 days. If such items are not returned, MFA may commence proceedings to liquidate its damages claim.

MFA has also requested punitive damages. The Court does not impose punitive damages at this time. Rather, if and to the extent the aforementioned property is not timely turned over to MFA, the Court will consider a punitive damage request in conjunction with proceedings to liquidate MFA's damages claim.

Lastly, MFA seeks the remedy of restitution. Restitution is available as an alternative to those remedies which protect an injured party's expectation or reliance interests in a contract. 22 Am. Jur. 2d Damages § 56. While damages are measured by the plaintiff's loss, restitution is measured by the defendant's unjust gain. Id. Restitution damages are typically resorted to when "recovery based on traditional notions of expectation damages is clouded ... because of the uncertainty in measuring the loss in value to the aggrieved contracting party." Fishkin v. Susquehanna Partners, G.P., CIV.A. 03-3766, 2007 WL 560703 (E.D. Pa. Feb. 12, 2007) aff'd in part, 340 F. App'x 110 (3d Cir. 2009).

Here, to the extent purchased assets are not returned to MFA, this Court is awarding to MFA actual damages suffered from Reinert's acts of conversion. MFA has not set forth an argument for awarding additional restitution damages; as such, this Court does not find awarding additional restitution damages is warranted here. MFA's request for restitution damages is therefore denied as being redundant.

## IV.

In conclusion, MFA's *Complaint in Equity* is denied in part and granted in part, and that portion of MFA's *Motion to Enforce the Sale* (which was not addressed in the Court's prior order of April 10, 2012) is granted. Specifically, the Court concludes that:

1.  Reinert is estopped from asserting that non-debtor entities own the assets sold to MFA. MFA purchased all of the assets related to the metal foundations business as provided for in the Asset Sale and Credit Bid Agreement (and exhibits attached thereto), regardless whether they were owned by other Reinert controlled entities (such as SAFE Foundations, LLC).

2.  Reinert must therefore return to MFA the Tooling, the six boxes of business records, the GAI software and the design drawings that Reinert has converted. Reinert must return these items to MFA within 30 days. If such items are not returned, MFA may commence proceedings to liquidate its damages claim for any and all damages proximately caused by Reinert's conversion.

3.  MFA's missappropriation of trade secrets claim is granted insofar as it relates to the GAI software and design drawings. It is denied as to the vibrator method of installation, the Z-type metal fin foundation, customer lists, and "metal foundations" as a trade name.

4.  MFA's tortious interference of contract and interference with prospective contracts is denied.

5.  Reinert is permanently enjoined and precluded from selling, using, possession, and transferring any of the assets acquired by MFA, including without limitation the Tooling, the six boxes of business records, the GAI software and the design drawings that Reinert has converted (and any further design drawings created using any converted design drawings).

6.  MFA's request for restitution damages is denied as redundant. MFA's request for damages based on unjust enrichment is also denied as MFA has adequate remedies at law.

7.  MFA request for punitive damages is not granted at this time. Rather, if and to the extent the aforementioned property is not timely turned over to MFA, the Court will consider a punitive damage request in conjunction with proceedings to liquidate MFA's damages claim.

8.  Any request by Reinert for damages and attorneys' fees is denied.

An Order consistent with this *Memorandum Opinion* shall be issued.

Date: 10·15·2012

**JEFFERY A. DELLER**
United States Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
Brian P. Fagan, Esq.
Roger M. Bould, Esq.
Donald R. Calaiaro, Esq.
Marcus Bentley Schneider, Esq.
Owen W. Katz, Esq.
Office of the U.S. Trustee

FILED

OCT 15 2012

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA